# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RICHARD D. POWELL,          )
                               )
        Plaintiff,      )
                               )
    v.                      )
                               )   No. 10 C 6813
XO SERVICES, INC., a Delaware  )
corporation, SCOTT GENTLES, DAVID )
NASH, and TRENT EDWARDS      )
                               )
        Defendants.     )

## MEMORANDUM OPINION AND ORDER

Plaintiff Richard Powell ("Powell") sued XO Services, Inc.[1] ("XO" or "the Company") and three of its employees -- Scott Gentles ("Gentles"), David Nash ("Nash"), and Trent Edwards ("Edwards") in the Circuit Court of Cook County, Illinois, asserting claims for defamation and breach of contract. Defendants removed the suit to this Court, and now seek to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim and Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction. For the reasons discussed below, the Rule 12(b)(6) motion is granted as to Nash and Edwards but denied as to Gentles and XO. Gentles's Rule 12(b)(2) motion is denied. Nash's and Edwards's Rule 12(b)(2) motion is denied as moot.

### I.

XO is a provider of telecommunications services for businesses.

---

[1] Defendants claim that the proper defendant is XO Communications, LLC, not XO Services, Inc.

In July 2007, the Company's network facility in Chicago experienced a power outage, resulting in a loss of services to many of its customers. The outage was caused by a shortage of "rectifiers" needed to convert AC power into DC power. As a result, XO's Central Office Engineering ("COE") in New Jersey, sent a Candeo Portable DC Power Plant ("the Plant") to the Chicago location. Powell insists that XO did not send all of the necessary equipment. By the time the Plant arrived, however, it was no longer needed. The Plant was never used and instead was stored in an XO facility in Oak Brook, Illinois.

In 2009, XO's Chicago location was undergoing an expansion, and employee Tom Schreck ("Schreck") was sent by XO to Chicago to assess the needed power upgrade. According to the complaint, Powell asked Schreck during the visit to inspect the Plant that had been sent during the 2007 outage. Schreck allegedly told Powell that the equipment was damaged and obsolete and that he should sell it for scrap. Acting on Schreck's directions, Powell had the equipment picked up and disposed of by a scrap dealer. Neither Powell, nor anyone else, received money in exchange for the Plant's disposal.

Schreck later told Gentles about the Plant that Powell had shown him. Schreck also told Gentles that he had instructed Powell to dispose of the equipment as scrap. Despite having this information, Gentles initiated an ethics investigation into the disposal of the Plant, persuading others that Powell had sold the

equipment and pocketed the money. According to Powell, Gentles had developed a personal animosity towards him because he had been critical of Gentles's performance in previous years.

On January 4, 2011, XO employees David Nash ("Nash") and Trent Edwards ("Edwards") traveled to XO's Chicago office and conducted an investigation into the matter. On January 5, 2010, they prepared a written report summarizing their interviews with witnesses and stating their findings and recommendations. The report concluded that Powell had disposed of the missing equipment at Schreck's direction. It recommended that Schreck be terminated and that Powell and one of his subordinates, Don Robinson, be given written warnings.

Nash and Edwards sent a copy of the report to Gentles, who wrote additional comments of his own on the document. Gentles's comments were more critical of Powell than were those in the report. Gentles wrote that Powell should be terminated and that Schreck and Robinson should be reprimanded and placed on probation. Powell alleges that the report with Gentles's handwritten comments was circulated among XO's upper management.

On January 6, 2010, Edwards and Nash met with Powell and issued him a written reprimand. The reprimand stated that Powell had failed to uphold his responsibility "to question and confirm the validity of [Schreck's] request" to dispose of the Plant. Compl. ¶ 55. It also stated that Powell had created a "management

environment [in which] subordinates [did] not feel empowered to challenge or disagree with [his] direction." *Id.* Edwards shook Powell's hand, telling him that the incident was over and that he looked forward to having a good working relationship with him in the future. The next day, however, Edwards told Powell that, after further discussions with XO's management, his employment was terminated.

**II.**

### A. Defamation

Count I of Powell's complaint asserts a claim for defamation *per se* based on the statements about him in the report. The defendants move to dismiss the claim pursuant to Fed. R. Civ. P. 12(b)(6), contending that the statements in the report are not actionable.

In order to prevail on a defamation claim, "plaintiff is required to prove that defendant made a false statement concerning plaintiff, that there was an unprivileged publication of the defamatory statement to a third party by defendant and that plaintiff was damaged." *Wynne v. Loyola Univ. of Chicago*, 741 N.E.2d 669, 675 (Ill. App. Ct. 2000). "Statements can be either defamatory *per quod*, i.e., requiring extrinsic facts to explain the defamatory character of the statements, or defamatory *per se.*" *Id.* "Four categories of statements are considered defamatory *per se*: (1) words that impute the commission of a criminal offense; (2) words

that impute infection with a loathsome communicable disease; (3) words that impute an inability to perform or want of integrity in the discharge of duties of office of employment; and (4) words that prejudice a party, or impute a lack of ability, in his or her trade, profession, or business." *Id.*

In Illinois, defamation suits are subject to the "innocent construction rule." "Under this rule, a written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se*." *Patlovich v. Rudd*, 949 F. Supp. 585, 590 (N.D. Ill. 1996) (quotation marks omitted). Furthermore, "[a]n offshoot of the innocent construction rule is that the court should, if the context permits, limit statements about the plaintiff to a particular setting or single instance, so that the statements do not generally impugn the plaintiff's fitness for his or her chosen occupation." *Skolnick v. Correctional Medical Services, Inc.*, 132 F. Supp. 2d 1116, 1124 (N.D. Ill. 2001).

Powell's complaint identifies thirteen allegedly defamatory statements. *See* Compl. ¶ 72. Of these, six are attributed to Nash and Edwards:

> (1) Edwards and Nash state: "During a routine audit of equipment by the Engineering Group (COE), it was determined that a $40,000 DC Power Plant had been taken to Chicago during a previous switch outage had been

disposed of."

(2) Edwards and Nash state: "Sander Gjokaj verified that he saw the DC Power Plant during the Chicago switch outage and could verify that it was delivered as outlined by Steen. He said he opened the cases containing the equipment and saw rectifiers."

(3) Edwards and Nash state: "Don Robinson said he questioned both Schreck and Dick Powell 'numerous times' about scrapping a seemingly unused power plant but was told to proceed, which he did."

(4) Edwards and Nash state: "In a December 16, 2009 email to Trent Edwards, Robinson stated that the unit was 'scrap' and they were just glad to get this scrap picked up and out of the warehouse.' When Robinson was questioned as to why he referred to the unit as scrap when he believed it was not, he said he did it because of fear of repercussions from Dick Powell if he questioned the decision."

(5) Edwards and Nash's 'findings' that purportedly arise from their interview of Powell are purposefully misleading, and/or false as specified by Powell in his January 5, 2009 memo. Edwards and Nash deliberately and intentionally did not include portions of Powell's corrections in their report, or even attempt to notify upper management that Powell disagreed with several material findings of fact made by Edwards and Nash arising from their interview with Powell.

(6) Nash, Edwards and Gentles all state that Powell lied to Nash and Edwards, and/or manipulated information provided to Nash and Edwards when they knew that Powell did not lie or fabricate information and that there was no evidence of Powell giving false statements.

Compl. ¶ 72.

Nash and Powell argue that these statements do not constitute defamation *per se*. I agree. Powell takes issue with statement (1) on the ground that it refers to the investigation as "routine," when in fact, he claims, the inquiry was part of a "witch hunt." He also

claims that statement (1) overstates the value of the Plant that was disposed of. Contrary to the report's estimation of $40,000, Powell contends that the Plant was worth only about $4,000. These statements, whether taken alone or in conjunction with the other statements singled out above, do not impugn Powell's integrity or his ability to perform his job.

Statement (2) likewise is not actionable. According to Powell, the statement falsely reports that Sander Gjokaj, a co-worker, verified that the Plant was delivered to the Chicago facility by John Steen. It is also false, Powell claims, that Gjokaj opened the cases and saw rectifiers. Once again, it is difficult to see how these statements impugn Powell's integrity or ability. Indeed, it is not entirely clear that Powell disputes the truth of what Gjokaj is alleged to have said. For example, Powell does not appear to deny that Steen delivered the Plant or that the cases contained rectifiers; he disputes only that a complete Plant, consisting of eight rectifiers, was ever received in Chicago.

Statements (3) and (4) essentially assert that Robinson did not challenge Powell's instructions regarding disposal of the Plant because he found Powell intimidating -- or, as Powell's written reprimand would later put it, that Powell had created a "management environment [in which] subordinates [did] not feel empowered to challenge or disagree with [his] direction." Compl. ¶ 55. That Powell may have made Robinson feel intimidated is not flattering,

but it does not rise to the level of defamation. Taking the innocent construction rule into account, the comment may be interpreted as indicating an unhealthy dynamic with one particular employee in one particular work environment. Once again, it does not impute a general inability to perform or want of integrity in discharging the duties of his employment.

Statement(5) does not consist of any actual assertions but instead alludes to information deliberately omitted from the report. Powell claims that although he disputed the report on several points, his objections were never included in the document. For example, Powell asserts that he never inspected the contents of the three cases delivered to the Chicago facility in 2007; that he asked Schreck to inspect the three cases in February 2009; and that in disposing of the Plant, he had acted on Schreck's instructions.

However, some of this information was included in the report, regardless of whether it was included at Powell's insistence. For example, the report concluded that Powell had indeed acted on Schreck's instructions when he scrapped the Plant. And insofar as the other statements are concerned, their omission once again simply does not rise to the level of defamation. Powell does not explain, for instance, why the report should be considered defamatory simply for omitting his claim that he never inspected the contents of the cases when they were first delivered.

Statement(6), which alleges that Nash and Edwards's report

accused Powell of lying and/or manipulating information, might seem to support a claim for defamation. The problem, however, is that no statement attributable to Nash or Edwards accused Powell of lying. In support of his argument on this point, Powell's response brief cites "the bottom of page 4 of the Nash/Edwards/Gentles report where the defendants all state that the plaintiff lied during the investigation." Resp. Br. at 4 n.1. But no such statement is found there. In fact, in the cited portion of the document, the report states that Powell accused *Nash* of lying.

Matters are less clear with respect to Powell's charge that the report accuses him of "manipulating information." Powell fails to cite any specific example from the report to support this claim. Moreover, it is noteworthy that, unlike in the case of Schreck, the report does not recommend that Powell be disciplined for being dishonest or untruthful in any way. Instead, the report suggests that Powell be issued a written warning only with respect to his "leadership style." Report at 5. Further, to the extent that the report suggests that Powell acted in a dishonest manner, it is susceptible to an innocent construction because it is narrowly focused on the particular incident in question; it does not impute a lack of integrity to Powell in any overarching sense.

This conclusion is reinforced when the foregoing comments are taken together and viewed within the context of the statement as a whole. Despite Powell's insistence to the contrary, he is not the

only, or even the primary, focus of the report. He is only one of many witnesses interviewed in connection with the incident. It is Schreck who ultimately admits, after initially giving a different story, that he told Powell that the equipment was scrap and directed him to dispose of it. Insofar as the report implicates Powell in disposing of the Plant, it makes clear that he acted on Schreck's orders. In short, the complaint's allegations fail to state a claim against Nash or Edwards for defamation *per se.* As to Nash and Edwards, therefore, Count I is dismissed.

In the case of Gentles's statements, however, matters are different. At the end of the report, Gentles is alleged to have written the following recommendation regarding Powell: "Terminate for bullying, authorizing false documents, scrapping good gear without authorization, scrapping with some guy off the street rather than a reputable company, turning a deaf ear to his manager on what he was throwing out, disobeying Joe St. Clair (from two years ago) of keeping plant on site for emergencies, asking an employee to vouch for a no-name vendor." Compl. ¶ 72(l). Elsewhere in the margins of the report, Gentles notes, "Shows pattern of lieing [sic] and intimidating his employees and asking them to cover up." Report at 3. Many of Gentles's other handwritten comments, though phrased in the form of questions, are intended to suggest that Powell was being untruthful.

Many of these statements are no doubt susceptible to innocent

construction.  For example, as with certain of the statements attributed to Nash and Edwards, some of Gentles's criticisms relate only to the incident involving the Plant and do not contain any general imputation regarding Powell's character or ability. Moreover, some of Gentles's statements -- accusing Powell of "bullying" and of "scrapping," for example, -- while disparaging, are on par with statements found in other cases to fall within the ambit of the innocent construction rule. *See, e.g.*, *Van Vliet v. Cole Taylor Bank*, No. 10 CV 3221, 2011 WL 148059, at *5 (N.D. Ill. Jan. 18, 2011) (statement that "Plaintiff has retained marketable securities as collateral for certain transactions without reflecting those securities on the collateral summary for management" was capable of innocent construction) (quotation marks omitted); *Anderson v. Vanden Dorpel*, 667 N.E.2d 1296, 1302 (Ill. 1996) (statement regarding plaintiff's "failure to follow up on assignments" could be innocently construed "to mean simply that the plaintiff did not fit in with the organization of the employer making the assessment and failed to perform well in that particular job setting"); *Marczak v. Drexel Nat. Bank*, 542 N.E.2d 787, 788 (Ill. App. Ct. 1989) (rejecting defamation *per se* claim based on statements that employee "did not perform up to the high standards expected of officers of the Bank", that "[s]he had some problems getting along with her supervisors and other officers," "was uncooperative and did not have the Bank's best interest at heart,"

and that "she did recently refuse to perform one of the responsibilities of her position"); *Kakuris v. Klein*, 410 N.E.2d 984, 986 (Ill. App. Ct. 1980) (statement that plaintiff "did not have the qualifications needed to achieve the objectives of the profession" was not defamatory *per se*).

However, Gentles accuses Powell of lying -- indeed, he accuses Powell of engaging in a pattern of lying -- and of authorizing false documents. These can be taken as imputing to Powell a want of integrity or ability in his employment. *See, e.g*, *Pease v. International Union of Operating Engineers Local 150*, 567 N.E.2d 614 (Ill. App Ct. 1991) (holding that "He lies a lot," constitutes defamation *per se*); *Swick v. Liautaud*, 662 N.E.2d 1238, 1244 (Ill. 1996) (defamation *per se* claim could be based on statement that plaintiff removed from premises a proprietary blueprint disclosing complete layout of new manufacturing system); *cf. Boese v. Paramount Pictures Corp.*, 952 F. Supp. 550, 555 (N.D. Ill. 1996) (noting that "[c]ourts have found that calling someone a liar or implying as much might permit defamation recovery").

The defendants argue that the offending comments are subject to a qualified privilege for claims arising out of an employer/employee relationship. "When the qualified privilege applies, the plaintiff must show that the defendant either intentionally published the material while knowing the matter was false, or displayed a reckless disregard as to the matter's

falseness." *Id.* (quotation marks omitted). Gentles contends that Powell is unable to overcome the privilege because his complaint fails to allege that he acted intentionally or recklessly. This is mistaken. Powell's complaint clearly includes such allegations. *See* Compl. at 1. Hence, Powell's claim against Gentles is not defeated by the qualified privilege.

In addition to the individual defendants, Powell seeks to hold XO liable under the doctrine of *respondeat superior*. XO notes that "[i]ntentional torts do not fall within the scope of the doctrine of *respondeat superior* unless the employee or agent is acting in furtherance (however misguidedly) of his principal's business." *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 913 (7th Cir. 1994). XO further argues that, according to Powell's own complaint, Gentles was acting on the basis of a personal vendetta, not in furtherance of XO's interests. But Powell does not allege that Gentles was acting *solely* on the basis of his own personal animus. In fact, the complaint elsewhere specifically alleges that Gentles and the other individual defendants were acting as agents of XO and within the scope of their employment. *See, e.g.*, Compl. ¶ 63. Thus, Powell's complaint can be read as alleging that Gentles acted to further both his own interests and the Company's.[2] So understood, his *respondeat*

_____

[2] For the same reason, the "fiduciary shield" doctrine does not apply here. The fiduciary shield doctrine "denies personal jurisdiction over an individual whose presence and activity in the state in which the suit is brought were solely on behalf of his employer or other principal." *Rice v. Nova Biomedical Corp.*, 38

-13-

*superior* claim remains viable. *See, e.g., Rice*, 38 F.3d at 913; *see also Sunseri v. Puccia*, 422 N.E.2d 925, 930 (Ill. App. Ct. 1981) (where employee acts with a dual purpose, liability under *respondeat superior* may attach). For these reasons, Powell has stated a defamation claim against Gentles and XO, but not against Nash or Edwards.

**B. Personal Jurisdiction**

The individual defendants have also moved pursuant to Fed. R. Civ. P. 12(b)(2) to dismiss Powell's suit for lack of personal jurisdiction. Since Nash and Edwards have already been dismissed under Rule 12(b)(6), and since there is no claim that personal jurisdiction is lacking as to XO, it is necessary only to consider the question of personal jurisdiction as it relates to Gentles.

A federal court exercising diversity jurisdiction has personal jurisdiction over the defendant if the state in which it sits would have such jurisdiction. *See, e.g.*, *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275 (7th Cir. 1997). The reach of Illinois' long-arm statute is coterminous with that of the due process clauses of the Illinois and U.S. Constitutions. 735 ILCS 5/2-209(c). Hence, I need only consider whether exercising personal jurisdiction over

F.3d 909, 912 (7th Cir. 1994). "The shield is withdrawn," however, "if the agent was acting also or instead on his own behalf -- to serve his personal interests." *Id.* (quotation marks omitted). Powell alleges that Gentles was motivated at least in part by precisely such personal interests.

Gentles would comport with Illinois and federal due process requirements. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 714-15 (7th Cir. 2002).

Under the Due Process Clause of the Illinois Constitution, a court may exercise jurisdiction "when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Id.* at 715 (quotation marks omitted). Although the Illinois Supreme Court has declined to hold that the reach of the state and federal constitutions is identical, it has stated that "in almost all cases, when federal due process concerns regarding personal jurisdiction are satisfied, so are Illinois due process concerns regarding personal jurisdiction." *Keller v. Henderson*, 834 N.E.2d 930, 941 (2005).

The exercise of personal jurisdiction satisfies federal due process requirements when the defendant has "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Internat'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). "The crucial inquiry is whether the defendant's contacts with the state are such that he should reasonably anticipate being haled into court there." *Internat'l Med. Group, Inc. v. Am. Arbitration Assoc.*, 312

F.3d 833, 846 (7th Cir.2002) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). In addition, the defendant must have purposefully availed himself of the privilege of conducting activities in the forum state, invoking the benefits and protections of its laws. *Burger King*, 471 U.S. at 474-75.

The complaint alleges that Gentles had various contacts with Illinois. The complaint's basic thrust is that Gentles had sufficient contacts with Illinois because Powell, who was the target of his alleged defamation efforts, was in Illinois. For example, Nash and Edwards conducted their investigation in XO's Chicago facility. According to Powell, Gentles remained in correspondence with Nash and Edwards while they were conducting their investigation in Chicago, hoping to influence their findings. In short, "[t]he contacts of the defendants in Illinois were not fortuitous in any way, but they were deliberate, planned over time, and were intended to have a harmful impact on the plaintiff in Illinois about events that occurred in Illinois." Pl.'s Resp. to Individual Defs.' Motion to Dismiss at 19.

Powell likens this case *Calder v. Jones*, 465 U.S. 783 (1984). There, a California resident sued a reporter and an editor of the *National Enquirer* for publishing an allegedly libelous story about her. The story was written in Florida; and both the reporter, South, and the editor, Calder, were citizens of Florida. South had made a number of phone calls to California in connection with the

article; and the article was published in California (as well as other states).  The Supreme Court held that the defendants were subject to personal jurisdiction in California.  The news story, the Court stated, "impugned the professionalism of an entertainer whose television career was centered in California.  The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California."  *Id*. at 788-89.  "In sum," the Court explained, "California is the focal point both of the story and of the harm suffered. Jurisdiction over petitioners is therefore proper in California based on the 'effects' of their Florida conduct in California."  *Id.* at 789.

While the present case is factually distinguishable from *Calder*, *Calder*'s holding is applicable here: the allegedly defamatory report concerned the Illinois activities of an Illinois resident; it allegedly impugned the integrity of an individual whose career was centered in Illinois. The report was based on Illinois sources, and "the brunt of the harm, in terms both of [plaintiff's] emotional distress and the injury to [his] professional reputation," was suffered in Illinois.  *Id*. at 788-89.  To paraphrase the Court: an individual injured in Illinois need not go to New Jersey (where Gentles lives) to seek redress from persons who knowingly cause injuries in Illinois.  *Id*. at 790.

The individual defendants seek to distinguish *Calder* on the

ground that the defendants in that case frequently traveled to California. *See* Individual Defs.' Reply at 11. That is not quite true. South had made numerous trips to California, but Calder had been to California only twice in his life. Moreover, neither of Calder's visits to California was related to the offending article. *Calder*, 465 U.S. at 786. South, too, submitted an affidavit stating that none of his trips to California had any connection with his work on the article. *Id.* at 786 n.4

In short, based on Gentles's conduct, he is subject to personal jurisdiction in this suit.

## C.   Breach of Contract

Count II of Powell's complaint alleges breach of contract against XO. XO argues that the claim must be dismissed because, as an at-will employee, Powell cannot plead that XO breached any contract in firing him. In his complaint, Powell argues that XO's employee handbook modified his at-will employment. *See* Compl. ¶ 81. In particular, he cites a section of the handbook that outlines procedures for formally reprimanding employees. The handbook allows employees to "respond to a formal reprimand in writing or use the Open Door Process to take the issue to a higher level of management or to Human Resources." Comp. ¶ 82. In his briefs, Powell additionally relies on the written reprimand and the verbal statements he received from Edwards. The complaint alleges that "Edwards shook the plaintiff's hand and told him that it was all

behind them and that Edwards looked forward to working with the plaintiff in the future." Pl.'s Resp. to 12(b)(6) Motion at 14. According to Powell, "[t]hese allegations of fact create a reasonable belief in the plaintiff that he was entitled, as a contractual matter, to specific disciplinary procedures before being terminated and that his conduct was subject only to reprimand, not termination." *Id.*

To begin with, the handbook did not modify Powell's at-will status. On the contrary, the handbook specifically states that an employee's at-will status cannot be modified except by XO's CEO. *See* XO Employee Handbook, Defs.' Rule 12(b)(6) Motion, Ex. A at 4 ("Your employment at XO Communications is at will, meaning that it is for no definite period of time and that either you or XO Communications may end the employment relationship at any time, for any reason or for no reason, with or without cause and with or without notice. This employment at will relationship cannot be changed and stays in effect regardless of any statements that may be made verbally or in policies, practices or any other written communications. Only the Chairman and Chief Executive Officer or the President and Chief Operating Officer of XO Communications can enter into any agreements concerning length of employment These agreements must be in writing and signed by the Chairman or President.").

The handbook's other provisions further undermine Powell's view. For example, the handbook specifically states that XO "does

not use mandatory progressive steps of corrective action." *Id.* at 4. According to the handbook, therefore, it was not necessary for XO to impose a lesser form of discipline on Powell before terminating his employment. As for the language of the reprimand and Edwards's alleged oral statements, even assuming that it were possible to modify Powell's at-will status, these statements would be incapable of giving Powell a reasonable belief that he was "entitled, as a contractual matter, to specific disciplinary procedures before being terminated" and that he was subject only to being reprimanded, not terminated. Powell does not cite a single case suggesting that language of this kind could give rise to contractual obligations.

Lastly, Powell invokes the notion of "condonation." He notes that under Illinois law, if an employee breaches his duty, an employer may condone the offending conduct by continuing to accept the employee's services without discharging him. If an employer condones the employee's conduct in this manner, the employer is presumed to have waived the breach of duty and will not be allowed to use that reason as a cause of termination after the waiver. However, as explained by the case Powell himself cites, *Foster v. Springfield Clinic*, 410 N.E.2d 604 (Ill. App. Ct. 1980), XO's actions cannot be regarded as a condonation. As *Foster* stated, "Illinois precedent indicates that when single acts of improper conduct by an employee are known by an employer and the employer

does not discharge the employee, the employer condones the misconduct. On the other hand, if the misconduct continues until the time of discharge, no condonation takes place." *Id.* at 609. Here, Powell does not claim that XO was aware of his alleged misconduct and chose to overlook it before later deciding to discharge him. Rather, when the matter came to its attention, XO conducted an investigation, and once it determined that Powell played a role in the Plant's disposal, XO disciplined him. True, XO did not initially terminate Powell's employment. Nevertheless, the fact remains that the company cannot be said to have overlooked Powell's conduct, and it was only the next day that XO discharged Powell. Hence, Powell's breach-of-contract claim is dismissed as to all defendants.

### III.

For the reasons discussed above, defendants' 12(b)(6) motion to dismiss is granted as to Nash and Edwards, but denied as to XO and Gentles; Gentles's Rule 12(b)(2) motion to dismiss is denied; and Nash's and Edwards's Rule 12(b)(2) motion is denied as moot.

**ENTER ORDER:**

Elaine E. Bucklo
United States District Judge

Dated: April 1, 2011